LAWRENCE, J.
Navy Mutual Aid Association (insurer) appeals a summary judgment in favor of Nancy R. Barrs (Barrs), determining that Barrs should recover under a policy insuring the life of her former husband, who apparently died of suicide. We affirm.
Barrs’ former husband, Commander James Barrs, in 1968, was insured by Navy Mutual Aid Association. Their 1989 divorce agreement provided that Barrs would be the irrevocable beneficiary of James’s 1968 policy. The insurer also sold Barrs additional insurance before James’s death, evidenced by a 1994 certificate. The trial judge found that, based on the circumstances commencing with the issuance of the 1968 policy up to and including the 1993-94 sale of additional insurance, the dealings between the parties were in the nature of a continuing contract providing continuing coverage, so that the later-obtained insurance was a continuation of the 1968 policy. The judge consequently found a two-year suicide-exclusion clause appearing on the reverse of the 1994 certificate to have run from 1968, rather than from 1994, and granted summary judgment for Barrs, awarding $119,-652.50 (insurance coverage purchased, minus a returned premium), plus $40,224.60 (prejudgment interest).
The insurer argues that the 1994 certificate is not ambiguous, and that the consideration of parol evidence was therefore improper. The 1994 certificate, on the front side, states: “The above-named individual is ... entitled to the following life insurance coverage(s) under this certificate as of the applicable effective date shown below” (emphasis added). The certificate however, in the third column of the reverse side, states: “Suicide — If, within two years from the effective date of a *347 benefit plan, any person on whose life the coverage applies dies of suicide ... the liability of the Association shall be limited to the amount the premiums paid for such plan” (emphasis added).
The use of the indefinite article “a” in the suicide-exclusion clause creates the ambiguity that the two-year suicide-exclusion runs from the date of any benefit plan, including the 1968 master policy. Parol evidence moreover is admissible to show the intent of the parties where several documents are part of one transaction and must be considered in pari materia to understand the transaction. Cf. Saco Dev., Inc. v. Joseph Bucheck Constv. Corp., 373 So.2d 419 (Fla. 1st DCA 1979) (so holding regarding contemporanéously executed documents, affirming a summary judgment against one of the parties); cf. also Hensley Ins. Co. v. Echols, 159 Fla. 324, 31 So.2d 625 (1947) (affirming judgment against the insurer, holding that parol evidence is admissible to show actions leading up to the execution and delivery of a written contract, to prove that a contract for a commission on the sale of homestead property, which the insurer knew to be homestead, was conditioned upon the signature of the contracting party’s wife, which condition never occurred). The trial judge thus properly considered parol evidence of the dealings between Barrs and the insurer. The undisputed evidence shows the following.
Barrs became concerned about her financial security when her former husband was laid off from Ford Aerospace in January 1993. The insurer regularly sent promotional material to Barrs through the years about eligibility for “additional coverage.” Barrs, in October 1993, talked to the insurer’s vice-president, Michael Brown, about additional insurance, because $200,000 of insurance that she had through Ford Aerospace was no longer available to her (apparently James made his new wife the beneficiary of this insurance). Barrs told Brown, “if Jim should die tomorrow, I’m going to be financially devastated, lose half my income just about.” Brown told Barrs that because Barrs already had one unit of insurance, Barrs was eligible for “19 more units with Navy Mutual,” amounting to $380,000 in additional life insurance. Brown recommended an increase from $20,000 to $120,000, the amount necessary to keep the status quo until the time Barrs could draw on James’s social' security. Barrs believed the 1994 insurance was add-on insurance; such construction to her was the only logical one given that she was told she could buy nineteen additional units of insurance, rather than a full twenty units (the maximum number of units available for purchase).
Brown, the insured’s vice president for membership since 1988, was responsible for the insurer’s marketing and preparation of its promotional materials. Brown admitted that all of the insurer’s promotional material omits reference to a suicide exclusion. Clients, Brown admitted, are notified of the suicide exclusion only if they ask (in which case Brown relates that fact to the insurer’s underwriting section), or by the arrival of their certificate after the completion of a purchase — if they read the certificate. Brown admitted that, during the solicitation process, he “wouldn’t mention [the suicide exclusion] and wouldn’t encourage anybody to do it.” Brown thus admitted he failed to mention suicide, or any other exclusion, to Barrs. Brown admitted that he spoke to Barrs in his marketing capacity; he mentioned only two conditions to the increased insurance: that James be medically approved, and that James make an assignment over to Barrs. Brown generated a note to his staff to send Barrs a brochure, application, and assignment form.
Barrs called two other insurers, OBA and USAA; she eliminated OBA because it did not provide an increase to the existing policy; she eliminated USAA because its insurance was “very expensive” relative to Navy Mutual. Barrs, based on her conversations with Brown, made her decision *348 to buy from the insurer. Barrs in 1993, with James’s cooperation (James was medically examined and approved, and executed an assignment of his interest to Barrs), paid for the recommended increase in insurance from $20,000 to $120,000. A certificate of insurance arrived in mid-March 1994, with a suicide exclusion clause on the reverse side of the certificate.
James died in St. Lucie County[1] on April 2, 1994, of a gunshot wound to the head.[2] Barrs, because a suicide-exclusion clause never previously was mentioned, was shocked to learn of it (the clause was absent from the 1968 master policy, and appeared only by incorporation of the insurer’s bylaws by reference in the 1968 policy; the 1994 certificate arrived after the conclusion of Barrs’ business interactions with the insurer and after James’s medical examination and assignment of interest). The evidence supports the judge’s legal conclusion that the 1994 certificate is a continuation of the 1968 master policy. See Inter-Ocean Cas. Co. v. Hunt, 138 Fla. 167, 174-75, 189 So. 240, 242 (1939) (“ ‘It is a well recognized rule of construction and interpretation of contracts for insurance that the contract or policy must be liberally construed in favor of the insured so as not to defeat, without plain necessity, his claim to the indemnity which, in making the contract of insurance, it was his purpose and intention to obtain. ... Where two interpretations equally fair may be given, that which gives the greater indemnity will prevail.’ ” (citations omitted) (emphasis added)) (affirming judgment for the insured).
The insurer nonetheless argues that the 1994 certificate is not ambiguous, in that a slow and careful reading makes clear that the 1994 certificate excludes stated benefits if the insured dies by suicide within two years of the effective date “of the benefit plan listed on the front page of the certificate.” The insurer’s quoted language however is itself a construction of the certificate language, rather than the express language of the certificate. The insurer’s argument therefore merely underscores the ambiguity.
The insurer also argues cases wherein courts, rejecting estoppel arguments, hold that in the absence of fraud, exclusion clauses will be enforced despite that the insurer’s agent did not inquire of the insured whether the exclusion might apply in the insured’s case. See Georgia Home Ins. Co. v. Hoskins, 71 Fla. 282, 71 So. 285 (1916) (holding enforceable a clause in a fire insurance policy excluding coverage on property encumbered by a chattel mortgage); Globe & Rutgers Fire Ins. Co. v. Segler, 44 So.2d 658 (Fla.1950) (holding enforceable a clause in an auto insurance policy excluding coverage on an auto subject to an encumbrance). These estoppel cases are inapplicable to the instant case. The trial judge did not base his judgment on estoppel, but rather awarded summary judgment upon a determination that the 1994 certificate was a continuation of the 1968 master policy.
The insurer further argues language from Evans v. Borkowski, 139 So.2d 472 (Fla. 1st DCA 1962), for the proposition that, on motion for summary judgment, the trial judge should not consider evidence which is inadmissible under the par-ol evidence rule. The insurer however omits the Evans court’s qualifier: “where the terms of a written agreement are not in doubt.” Id. at 474. The terms of the instant 1994 certificate, in contrast to the contract in Evans, are in doubt; Evans thus is inapposite.
The insurer also relies on Deni Associates of Florida, Inc. v. State Farm Fire & *349 Casualty Insurance Co., 711 So.2d 1135 (Fla.1998), wherein the court declined to adopt the doctrine of reasonable expectations. Deni however is inapplicable; the trial judge, rather than relying upon reasonable expectations, relied on the evidence that the 1994 certifícate is a continuation of the 1968 master policy.
The insurer also argues that the mere fact that an insurance provision more clearly can be drafted does not mean that a provision is ambiguous. Equally true however is that ambiguous language is ambiguous despite that the language can be drafted more artfully.
The trial judge correctly determined, as a matter of law, that the 1994 certificate was a continuation of the 1968 policy. We accordingly AFFIRM the judgment of the trial court.
WOLF, J., CONCURS.
JOANOS, J., DISSENTS WITH WRITTEN OPINION.

. Barrs lives in Pensacola. James was living in Port St. Lucie when he died.

. James's death certificate lists suicide as the cause of death. The cause of death nevertheless is in dispute because Barrs says that no gun or shell casings were found near James's body, no powder burns were found on his body, and the gun involved in James’s death was found hidden in a neighbor's kitchen; the neighbor is a friend of James's estranged wife.